UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                    :
DANNY MALDONADO,                                    :
                                                    :
                            Petitioner,             :       **MEMORANDUM AND ORDER**
                                                    :
            - against -                             :
                                                    :       1:05-cv-3132-ENV
CALVIN WEST, Superintendent, Elmira                 :
Correctional Facility,                              :
                                                    :
                            Respondent.             :
                                                    :
-------------------------------------------------------------X

VITALIANO, D.J.

        Danny Maldonado has petitioned this Court for a writ of habeas corpus, pursuant to 28

U.S.C. § 2254. For the reasons set forth below, the writ is denied and the petition is dismissed.

                    **FACTUAL BACKGROUND AND TRIAL TESTIMONY**

        On the evening of March 24, 1999, two sets of brothers were involved in a street

confrontation in the Bushwick section of Brooklyn: Jimmy and Victor Ramirez on one side, and

Angel and Wilfredo Hernandez on the other. The Ramirez and Hernandez brothers had crossed

swords in the past. Before the Hernandez brothers moved to the neighborhood, Victor Ramirez

had dated a girl named Christine. But, when the Hernandez brothers arrived, the 16 year-old girl

soon became enamored with them. She was not alone; the brothers became popular with many

area residents. The Hernandez brothers were wealthy due to a settlement in a personal injury

lawsuit, and according to Victor Ramirez, the two used their money to show off fancy cars and

jewelry. According to the testimony of Victor Ramirez and Miguel Arce, another area resident,

the Hernandez brothers also used their money to buy protection from an entourage of young men.

Acknowledging their popularity, Angel Hernandez testified that many liked to be around him and his brother because the two would "pick up the check and things like that."

Angel Hernandez confirmed the past hostilities between the two sets of brothers. He testified that Victor Ramirez had instigated fights due to jealousy over Angel's relationship with Christine. The first fistfight between the two teens ended with Victor striking Angel, causing Angel to fall to the ground and lose a tooth. After the fight, Angel's older brother, Wilfredo, began to threaten Victor. According to Victor, Wilfredo said he had a gun and had shown off a .38-caliber revolver, the same weapon that Victor identified at trial as the one used to injure him and kill his brother, Jimmy.

On the night of March 24, 1999, Victor Ramirez and the Hernandez brothers would cross paths again – several times. Victor first encountered the Hernandez brothers, who were with a large group of young men, on his way home from a movie. According to Victor, during this encounter Wilfredo tried to run him over with a BMW. A street brawl ensued, but ended when police sprayed the group with mace. Later that night, Victor attempted to find the Hernandez brothers to make an effort at conciliation, but when he came into contact with Angel nine blocks from the scene of the earlier fight, Angel immediately retreated. Unfortunately, Wilfredo did not view Victor's visit as a conciliation effort. He gathered several other individuals, including petitioner. The group assembled in front of the Hernandez's home. Several witnesses who participated in the events that followed would tell their tales at trial. The relevant portions of their individual testimonies follow:

2

i.    *Victor Ramirez's Testimony*

Victor Ramirez told his brother Jimmy of his earlier confrontation with the Hernandez brothers. According to Victor, Jimmy had grown tired of watching his younger brother fight with the same group of young men in the neighborhood. Jimmy decided to drive Victor to the street where the Hernandez brothers lived so that Victor and Angel could have a final fistfight to end matters between them. When the Ramirez brothers reached the location, Jimmy's car skidded and hit Angel Hernandez's vehicle. Victor claimed that the collision was an accident. Almost immediately, Angel ran after Victor and the two began fighting. Everyone watched the one-on-one fight, with Jimmy cheering for his brother. Victor testified that he hit Angel hard several times, but that the brawl did not finally conclude until Angel bit Victor, who then decided he should leave to get a tetanus shot. Before the Ramirez brothers could leave, however, Jimmy began speaking with one of Wilfredo's entourage, V.I., who was attempting to calm matters. Next, Victor observed Maldonado approach Jimmy. Victor observed petitioner push Jimmy and say, "I'll blast you. I'll blast you." Jimmy responded, "go ahead."[1] Victor watched Maldonado retreat from the street to where Wilfredo Hernandez was located. At this point, Victor could not see petitioner, but then, suddenly, petitioner emerged from behind a van, walked up to Jimmy Ramirez and said, "you know what, fuck that." Maldonado then pointed the gun straight at Jimmy's head and shot. Petitioner next turned and shot at Victor. The young men then scattered. Wilfredo sped off in his BMW, running over the leg of Jimmy Ramirez, who was on the ground and apparently already dead.

---

[1] Victor Ramirez acknowledged that, when testifying before the grand jury, he had never indicated that petitioner approached his brother prior to the shooting.

3

ii.     *Miguel Arce's Testimony*

Miguel Arce was a friend of Wilfredo Hernandez, but he did not know all of the other young men at the scene. According to Arce, Wilfredo had waved around a pistol before the Ramirez brothers arrived. Wilfredo told his friends that if "any problem led the wrong way" to shoot in the air "to scare them or something." Arce also recalled Wilfredo saying something about jumping the Ramirez brothers. Arce testified that Jimmy Ramirez initially arrived at the scene by himself. Arce then began to fight with Jimmy, but the two were separated. They next began talking about settling the disagreement. Jimmy then left the scene to get his brother Victor so that the matter could be settled through a final fistfight. Jimmy and Victor arrived at the scene and crashed into Angel Hernandez's car. A one-on-one fight ensued between Victor and Angel. Arce believed that Victor beat up Angel. At the fight's conclusion, Arce and the others present tried to calm the matter. But then, according to Arce, "all of a sudden we're in the street and along comes [Maldonado], and he shot Jimmy in the head." Before the gun was fired, Arce had heard someone in the crowd say "no, fat boy, don't shoot." Arce heard three shots in total. After watching the shooting, Arce ran from the scene.

iii.     *Angel Hernandez's Testimony*

Angel Hernandez confirmed the testimony of others that, after the initial skirmish between himself and Victor earlier in the evening, Jimmy Ramirez had shown up alone in front of the Hernandez's building. Jimmy then began fighting with Miguel Arce. Jimmy and Miguel stopped voluntarily, however, and Jimmy then left, saying that he would return with his brother who would fight Angel in a fair fight. Next, the Ramirez brothers arrived at the scene. On

arrival, Jimmy's vehicle slammed into Angel's. Angel claimed that it was at this point that Victor initiated a fight with him. During the fight, while Angel was getting hit repeatedly, Jimmy yelled that the block now belonged to the Ramirez brothers. Angel testified that the fight ended after he got hit in the head and walked away. Angel claimed that he was still walking away when he heard three gun shots and turned back to see petitioner holding a firearm. Angel then ran from the scene to a friend's house. Angel denied that he had ever seen his brother Wilfredo possess a gun.

iv.   *James Nieves's Testimony*

James Nieves was a friend of the Hernandez brothers. Nieves was present near the Hernandez's building, waiting to play billiards with Wilfredo Hernandez, when he saw a fight break out between Miguel Arce and Jimmy Ramirez. Nieves recalled that the fight went on for "like five, ten minutes" before Jimmy Ramirez left the scene to get his brother. The Ramirez brothers returned approximately 20 minutes later and crashed into Angel Hernandez's car. Then Victor started fighting with Angel. Nieves told how the fight lasted for about three minutes and that Victor won and then walked away. Angel then retreated to the area in front of his house, where his brother Wilfredo was standing. After the fight, Jimmy remained upset and exchanged words with a tall, African-American young man who was trying to calm the situation. Nieves was at the street corner talking to his brother-in-law, who had also been at the scene, when he heard three gunshots ring out from behind him. Nieves ducked and covered himself. When he finally turned to look, Nieves saw Jimmy lying on the ground and Maldonado with a gun. Nieves was in shock and immediately went home. Nieves could not recall ever observing Wilfredo

5

possess a gun or even talk about possessing a gun.

v.    *Joshua Gonzalez's Testimony*

Joshua Gonzalez was also present at the crime scene, as he was looking after a friend, V.I. Gonzalez came because Wilfredo Hernandez had told him that there was a "problem going on" involving V.I. According to Gonzalez, Wilfredo drove him and two other young men, including petitioner, to the Hernandez's block. Shortly after their arrival, Wilfredo re-emerged from his home with a revolver that Wilfredo said was a .357 magnum. Gonzalez observed Wilfredo tell the others who were present that "we're only going to use it if it's necessary; as a matter of fact, we're not going to use it at all." According to Gonzalez, Wilfredo added something to the effect of "we ain't going to use it; we're going to jump him." After some time, Jimmy Ramirez arrived and asked who had a problem with his brother. A short fight between Jimmy and Miguel Arce followed, but the fight was broken up and Jimmy left in a car to get his brother. About five to ten minutes later, the Ramirez brothers returned and Victor began fighting with Angel Hernandez. Gonzalez described how the fight ended when Victor knocked Angel's tooth out and how, after the fight, Jimmy was yelling that he would fight anyone who was present. V.I. tried to calm Jimmy, but then, suddenly, Maldonado walked up to Jimmy, said "fuck that shit," and fired a shot at Jimmy's head. Gonzalez next observed petitioner turn and shoot Victor Ramirez twice. After the shooting, Gonzalez ran to a friend's house. Gonzalez claimed at trial that he had observed Wilfredo speak to petitioner at the point before the shooting when petitioner took the firearm. According to Gonzalez's account, Maldonado said "fuck that; we got to do this because these niggers played the brother; they're just playing us. Let's just do

6

this." Wilfredo then responded by saying, "just shoot in the air, just shoot in the air."

vi.     *Jose Feliciano's Testimony*

Jose Feliciano, an acquaintance of the Hernandez brothers, was also present at the crime scene. He observed an initial "argument" between Jimmy Ramirez and the Hernandez brothers and then Jimmy leaving the scene to get his brother. Feliciano recounted how the Ramirez brothers returned about 20 minutes later, at which point, a fight ensued between Victor and Angel, but quickly ended because Victor beat up Angel. Feliciano claimed that "we stopped the fight" because Angel had bitten Victor. After the fight, the Ramirez brothers stood together in the middle of the street. Feliciano was among those trying to calm matters. At some point, Feliciano observed Wilfredo Hernandez go into his building and then return to the street with a black gun. Feliciano claims that Wilfredo was very angry and was jumping around and waving the gun because his brother had been beaten; it looked like Wilfredo wanted to shoot. Feliciano claims that he next saw Maldonado tell Wilfredo to pass him the gun and then grab the gun. Petitioner said "fuck that" in an angry tone, shot at Jimmy's head and then shot Victor. Three shots were fired in all. Feliciano, who was close to where the shots were fired, began running from the scene. He would return moments later and observe Victor holding Jimmy on the ground while the Hernandez brothers drove off in a BMW.

vii.    *Detective Juan Vasquez's Testimony*

On March 27, 1999, Maldonado was arrested in Bridgeport, Connecticut, where his mother lived. After being taken into custody, petitioner was questioned by Detective Juan Vasquez of the New York City Police Department. Petitioner signed a form indicating that he

7

understood his Miranda rights and wished to speak with Detective Vasquez without an attorney present. Petitioner initially stated that he knew nothing about the homicide that had occurred on March 24th, but after being told that others had implicated him, petitioner admitted he was present at the crime scene. Petitioner gave Detective Vasquez a statement that, on the night of the shooting, he was taken to the crime scene by Wilfredo Hernandez, who told him that there would be a party. In his statement, petitioner told Detective Vasquez that he observed fighting, and at some point, a tall man named Flaco had given him a gun and threatened him, telling him "to do it" or he and his mother would be killed. Petitioner stated that Flaco was hitting him in the back with an object. According to the statement, petitioner took the gun and fired with his eyes closed.

viii.    *Danny Maldonado's Testimony*

At trial, Maldonado initially admitted that his earlier statement to Detective Vasquez was a lie.[2] Petitioner claimed that when he had given the statement, after his arrest in Connecticut, he was still in fear of Wilfredo Hernandez. Petitioner told the jury that he was present at the crime scene and had attempted to break up a fight, but that he was hit in the face. On this point, petitioner appeared to concede on cross-examination that he was struck by Jimmy Hernandez, as

---

[2]  In relevant part, petitioner's testimony was as follows:

> Q:    Now, Danny, I'm going to take you back to that night, March 24 of 1999
> – actually before I do that, I'm going to ask you, do you remember giving
> that statement to the detective, Detective Vasquez?
> A:    Yes.
> Q:    Was that true or was it not true?
> A:    It wasn't true.

(Maldonado: 357). Petitioner never explained what specific portions of his earlier statement were untrue, and his trial testimony suggested that he was attempting to disclaim his entire previous statement to Detective Vasquez.

8

he had earlier told Detective Vasquez. But, on re-direct, petitioner asserted that any statement that he had been struck by Jimmy Ramirez was a lie. Maldonado next told the jury that, after the fight between Victor Ramirez and Angel Hernandez had been broken up, Wilfredo was standing on the stairway in front of his building screaming that the Ramirez brothers should be jumped. Petitioner claimed that, when no one listened, Wilfredo entrapped and threatened him. On this point, though, petitioner was yet again unclear. On direct examination, Maldonado stated that Wilfredo told him to "do what he was telling me" or that Wilfredo would kill petitioner and petitioner's mother. On cross-examination, however, Maldonado testified clearly that he had been told by Wilfredo to kill Jimmy Ramirez. Petitioner submitted at trial that he complied only because he feared Wilfredo, but conceded on cross-examination that he had other options:

> Q: So at that point you had the gun in your hand, you could have walked away? Yes?
> A: My fear was that they'd kill me.
> Q: But you had the gun in your hand; you could have walked away. Yes?
> A: Yes.
> Q: You could have ran away? Yes?
> A: Yes.
> Q: You could have pointed the gun at Wilfredo and told him, no, I'm not going to kill another human being. You could have done that. Right?
> . . .
> Q: Yes, Mr. Maldonado?
> A: Yes.
> Q: But instead you took the life of another human being? Yes?
> A: Yes.

(Maldonado: 372-73.). To further discredit petitioner's duress defense, the prosecution also elicited from petitioner that he had met up with the Hernandez brothers again after the incident.

All of petitioner's testimony was offered against the backdrop of an *in limine* ruling that

the prosecution could cross-examine him regarding the events underlying his prior weapons possession arrest in order to rebut his duress defense. During the prior incident, police had apprehended petitioner after responding to a report that a man, whose description matched petitioner, was carrying a firearm at a rooftop location. At the scene, police found a duffel bag containing a shotgun several feet from petitioner. Although Maldonado was arrested, charges were subsequently dropped after he pled guilty to a violation. On cross-examination, petitioner denied that he had ever handled a firearm. The prosecutor questioned petitioner regarding a photograph, not submitted to the jury, in which petitioner is depicted holding three pistols. Petitioner claimed that the pistols were fake.

ix.   *Dr. Margaret Prial's Testimony*

Dr. Margaret Prial testified regarding her autopsy of Jimmy Ramirez. The autopsy revealed a gunshot wound on the left side of his head that was surrounded by stippling. Dr. Prial testified that the muzzle of the murder weapon was not more than two feet away from the victim's face when it was fired.

**PROCEDURAL HISTORY**

A jury rejected petitioner's duress defense and convicted him of second-degree murder, N.Y. Penal Law § 125.25(1), second-degree attempted murder, N.Y. Penal Law §§ 110.00, 125.25(1), and two counts of second-degree criminal possession of a weapon, N.Y. Penal Law § 265.03(2) (2000). On June 27, 2000, Maldonado was sentenced to an indeterminate prison term of 25 years to life for the second-degree murder conviction, and determinate prison terms of 10 years concurrently for each weapons possession conviction and 20 years consecutively for the

10

attempted murder conviction.

Petitioner appealed his judgment of conviction to the New York State Supreme Court, Appellate Division, Second Department ("Second Department"), contending that: (i) the trial court erred by declining to submit to the jury a charge of first-degree manslaughter, N.Y. Penal Law 125.20(1), as a lesser included offense of second-degree murder; (ii) the trial court erred by allowing the prosecution to rebut petitioner's duress defense by adducing evidence of his prior gun possession; and (iii) his sentence was excessive. On March 8, 2004, the Second Department rejected petitioner's claims and affirmed the judgment of conviction. People v. Maldonado, 5 A.D.3d 505, 772 N.Y.S.2d 583 (2d Dep't 2004). Considering petitioner's first claim, the appellate court concluded that the trial court had acted properly by refusing to submit a manslaughter charge to the jury because "there was no reasonable view of the evidence, when viewed in the light most favorable to the defendant, to support a finding that he intended only to cause serious physical injury rather than to kill" Jimmy Ramirez. Id. at 506. The holding rested on the proof at trial establishing that Maldonado had shot the victim in the head from less than two feet away. Id. The Second Department also concluded that the trial court had properly allowed the prosecution to rebut petitioner's duress defense "with evidence of his criminal disposition or inconsistent intent." Id. Finally, petitioner's excessive sentence claim was found to be without merit. Id. at 507. On June 24, 2004, Judge Susan Phillips Read of the New York State Court of Appeals denied petitioner's application seeking leave to appeal the decision of the Second Department. People v. Maldonado, 3 N.Y.3d 643, 782 N.Y.S.2d 414, 816 N.E.2d 204 (2004).

Maldonado filed the instant petition on June 22, 2004. It raises the same three contentions that were raised on direct appeal to the Second Department. Additionally, it asserts a fourth claim that petitioner was denied "his due process right when the trial court failed to submit intentional murder counts of the indictment to the jury in the alternative."

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214, 1219 (1996) ("AEDPA"), a writ of habeas shall not issue with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication (1) was contrary to or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court delineated an analytical framework to guide review of habeas claims, identifying the need to treat independently the "contrary to", and "unreasonable application" clauses of Section 2254(d)(1). With respect to the "contrary to" clause, a writ may issue if the state-court decision "contradicts the governing law set forth in [Supreme Court] cases" or arrives at a different conclusion from the Supreme Court on "materially indistinguishable" facts. Id. at 405-06. With respect to the "unreasonable application" clause, a writ may issue if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The "unreasonable application" inquiry, however, is limited, and the habeas court may only issue a writ where the state court's application of

Supreme Court precedent was "objectively unreasonable." Id. at 409. "Some increment of incorrectness beyond error is required" for a decision to be considered objectively unreasonable, though the increment need not be great. Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000).

## DISCUSSION

I.     *Failure to Submit Manslaughter as a Lesser Included Offense*

Petitioner contends that the trial court should have charged the jury that it could consider first-degree manslaughter as a lesser included offense of second-degree murder. In Beck v. Alabama, the United States Supreme Court held that a trial court's failure to submit lesser included offenses to a jury violates due process in capital cases, but the court expressly reserved the question of whether its holding applies in noncapital cases. 447 U.S. 625, 638 n.14, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); see also Gilmore v. Taylor, 508 U.S. 333, 361, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993) (Blackmun, J., dissenting). In Knapp v. Leonardo, the Second Circuit noted that neither it nor the Supreme Court had yet "decided whether the failure to instruct the jury on lesser included offenses in noncapital cases is a constitutional issue that may be considered on a habeas petition." 46 F.3d 170, 179 (2d Cir. 1995). The Second Circuit went even further, in Jones v. Hoffman, 86 F.3d 46 (2d Cir. 1996) (per curiam), by holding that it was precluded from considering the issue on habeas review because extension of the Beck holding to noncapital cases "would involve the announcement of a new [constitutional] rule," which is generally disallowed on habeas review. Jones, 86 F.3d at 48 (citing Turner v. Marshall, 63 F.3d 807, 819 (9th Cir.1995)); see generally Teague v. Lane, 489 U.S. 288, 316, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) ("[H]abeas corpus cannot be used as a vehicle to create new constitutional

13

rules of criminal procedure unless those rules would be applied retroactively to all defendants on collateral review."). For district courts in this circuit, then, the effect of Knapp and Jones is to preclude habeas review of a state trial court's failure to instruct on lesser included offenses in noncapital cases. See Sullivan v. O'Keefe, No. 00-cv-2292, 2000 WL 1072304, at *5 (S.D.N.Y. Aug. 2, 2000); see also Peakes v. Spitzer, No. 04-cv-1342, 2004 WL 1366056, at *12 (S.D.N.Y. Jun. 16, 2004) (collecting habeas cases showing the uniform rejection of lesser included offense claims by district courts in this circuit). Accordingly, petitioner's lesser included offense claim cannot be a basis for habeas relief.[3]

---

[3] In any event, the Court would not find that the Second Department's decision on this point was contrary to or involved an unreasonable application of New York law; a rule of law which is "consistent with any federal constitutional standard that might arguably apply." House v. Miller, No. 02-cv-5379, 2003 WL 23198788, at *16 (E.D.N.Y. Oct. 27, 2003); Peakes, 2004 WL 1366056, at *13 n.21. "Under New York law the trial court need only submit a lesser included offense when: (1) it is impossible to commit the greater offense without committing the lesser, and (2) there exists a reasonable view of the evidence that defendant did in fact commit the lesser, but not the greater offense." House, 2003 WL 23198788, at *16 (citing N.Y. Crim. Proc. Law § 300.50(1); People v. Glover, 57 N.Y.2d 61, 63, 453 N.Y.S.2d 660 (1982)). Maldonado shot Jimmy Ramirez in the head from within two feet, and he then fired two additional shots, one of which struck Victor Ramirez in the abdomen. There was no evidence presented at trial that would support a rational conclusion that petitioner intended to cause serious physical injury rather than kill the victim. In a very similar case, where another petitioner fired a single shot at the intended victim's head from just three feet away, and where that petitioner had failed to present any evidence supporting a lesser charge at trial, another judge of this Court concluded that the state trial court properly refused to instruct on first-degree manslaughter as a lesser included offense of second-degree murder. Kelly v. Greiner, No. 97-cv-7535, 1999 WL 84077, at *5-6 (E.D.N.Y. Feb. 11, 1999). The present case is distinguishable from Kelly in that, here, petitioner actually testified at trial. Yet his testimony is of no help; he testified that he acted under duress and responded to an order of "kill or be killed." (Maldonado: 374.) Duress is a complete defense that implies the denial of any criminal intent. People v. Calvano, 30 N.Y.2d 199, 205, 331 N.Y.S.2d 430 (1972). Petitioner's defense was an all or nothing defense, and the Second Department concluded that the evidence in the record could not support an intermediate charge of first-degree manslaughter. Cf. People v. Rielly, 190 A.D.2d 695, 593 N.Y.S.2d 275 (2d Dep't 1993) (affirming trial court's refusal to charge manslaughter as a lesser included offense of second-degree murder where petitioner had presented an account that, if anything, would have supported acquittal on the basis of an accidental shooting). There is no indication that petitioner's counsel ever suggested asserting a defense of extreme emotional disturbance, which unlike duress, is not a complete defense. See N.Y. Penal Law § 125.25(1)(a). Here, given all of the evidence, and in particular, the manner in which the victim was shot, this Court could not conclude that the Second Department's affirmance was contrary to or an unreasonable application of the standard applied under N.Y. Crim. Proc. Law § 300.50(1).

14

II.    *Admission of Prior Bad Act Evidence to Rebut Duress Defense*

Maldonado maintained at trial that he had acted under duress on the night of March 24, 1999. He claimed that Wilfredo Hernandez had pulled him aside and given him a gun, telling him to kill the older brother and that, if petitioner failed, he and his mother would be killed instead. The trial court determined, after hearing argument, that the prosecution could, in the event that petitioner took the stand, rebut the duress defense with evidence of petitioner's criminal disposition or inconsistent intent. Specifically, the trial court allowed the prosecution to cross-examine Maldonado regarding the underlying facts of his prior arrest for possession of a shotgun, despite the arrest not having culminated in a charge of criminal weapons possession. During that incident, police responded to a report that a man whose description matched petitioner's was carrying a firearm at a rooftop location. When police arrived at the scene, a shotgun was discovered several feet from petitioner in a duffel bag on the ground. The prosecution's apparent purpose in offering this evidence was to undercut the notion that petitioner had been coerced into carrying a gun on March 24, 1999 by showing that, on a prior occasion just months before, petitioner had possessed a firearm in the absence of duress.

States are generally afforded wide latitude in developing and applying their own rules of evidence. See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); Lipinski v. New York, 557 F.2d 289, 292 (2d Cir. 1977). For a habeas petitioner to prevail on a claim that a state court's evidentiary error constituted a deprivation of due process, he must show that the error was so pervasive that it denied him a fundamentally fair trial. Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985) (citing United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392,

15

49 L.Ed.2d 342 (1976)). In assessing the alleged evidentiary error, a habeas court's duty is to ensure that the petitioner was given a fair trial – not a perfect one. Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

The Supreme Court, in addressing a due process challenge to the alleged improper admission of evidence of prior bad acts, has stated that

> [j]udges are not free, in defining 'due process,' to impose on law enforcement officials [their] 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.' Rochin v. California, 342 U.S. 165, 170, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952) . . . . [They] are to determine only whether the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935), and which define 'the community's sense of fair play and decency,' Rochin v. California, supra, at 173, 72 S.Ct., at 210.

Dowling v. United States, 493 U.S. 342, 353, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (quoting United States v. Lovasco, 431 U.S. 783, 790, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977)) (alterations in original). "Admission of 'other crimes' evidence provides a ground for federal habeas relief only if 'the evidence's probative value is so conspicuously outweighed by its inflammatory content, so as to violate a defendant's constitutional right to a fair trial.'" Bronshtein v. Horn, 404 F.3d 700, 730 (3d Cir. 2005) (Alito, J.) (quoting Lesko v. Owens, 881 F.2d 44, 52 (3d Cir. 1989)); accord Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998); Watkins v. Meloy, 95 F.3d 4, 7 (7th Cir. 1996); Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985); Dalcin v. New York, 438 F. Supp. 2d 176, 182 (W.D.N.Y. 2006); Miller v. Portuondo, 151 F. Supp. 2d 245, 248 (E.D.N.Y. 2001). Even within the federal system, where the deferential AEDPA standard does not apply, trial courts are given broad discretion in determining whether to admit evidence of

prior uncharged crimes and acts, and such determinations will only be overturned where the trial court acted "arbitrarily and irrationally." United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992); United States v. Smith, 727 F.2d 214, 220 (2d Cir. 1984).

Under longstanding New York and federal law, evidence of uncharged crimes is generally inadmissible to show a defendant's general propensity toward criminal conduct. Spencer v. Texas, 385 U.S. 554, 560-61, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967); Roldan v. Artuz, 78 F. Supp. 2d 260, 277 (S.D.N.Y. 2000) (citing cases); People v. Molineux, 168 N.Y. 264, 291, 61 N.E. 286 (1901); Fed. R. Evid. 404(b). The general rule is based on the judgment that evidence of other crimes, though bearing some probative value, carries too great a risk of prejudice, as a jury may "base a finding of guilt on collateral matters or . . . convict a defendant because of his past." People v. Alvino, 71 N.Y.2d 233, 241, 525 N.Y.S.2d 7, 519 N.E.2d 808 (1987); People v. Ventimiglia, 52 N.Y.2d 350, 359, 438 N.Y.S.2d 261, 420 N.E.2d 59 (1981); see also Michelson v. United States, 335 U.S. 469, 475-476, 69 S.Ct. 213, 93 L.Ed. 168 (1948). Evidence of other crimes is admissible, however, if relevant to an issue other than the defendant's criminal character. People v. Beam, 57 N.Y.2d 241, 250, 455 N.Y.S.2d 575, 441 N.E.2d 1093 (1982); Roldan, 78 F. Supp. 2d at 277; accord Fed. R. Evid. 404(b). As stated in the often-referenced New York Court of Appeals decision in Molineux, the issues regarding which evidence of other criminal acts may be admitted include "(1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial." Molineux, 168 N.Y. at 293; accord Fed. R.

17

Evid. 404(b) ("It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."). In these cases, the evidence of other crimes still carries a risk of prejudice, but admission is nonetheless justified due to the evidence's more compelling probative value. People v. Santarelli, 49 N.Y.2d 241, 247, 425 N.Y.S.2d 77, 401 N.E.2d 199 (1980). The Molineux categories are illustrative and act as a guidepost for New York courts in determining whether to admit evidence of other crimes. Id.; People v. Rojas, 97 N.Y.2d 32, 37, 735 N.Y.S.2d 470, 760 N.E.2d 1265 (2001).

New York courts also allow for the admission of similar acts if the defendant has asserted a defense that puts his criminal disposition squarely in issue. See Santarelli, 49 N.Y.2d at 248; People v. Calvano, 30 N.Y.2d 199, 204, 331 N.Y.S.2d 430, 282 N.E.2d 322 (1972). For example, when a criminal defendant asserts an entrapment defense, he necessarily injects the issue of his criminal disposition into the case. Santarelli, 49 N.Y.2d at 248. New York's codification of the entrapment defense requires a defendant to show that he was "induced or encouraged" to commit a crime due to overzealous police activity of the kind that creates "a substantial risk that the offense would be committed by a person not otherwise disposed to commit it." N.Y. Penal Law § 40.05. A defendant asserting an entrapment defense is thus said to open the door to evidence of similar prior acts. Santarelli, 49 N.Y.2d at 248. The federal rule is no different. Sorrells v. United States, 287 U.S. 435, 451-52, 53 S.Ct. 210, 77 L.Ed. 413 (1932); United States v. Brand, 467 F.3d 179, 200 (2d Cir. 2006); United States v. Harvey, 991 F.2d 981, 994 (2d Cir. 1993). The Advisory Committee Note to Federal Rule of Evidence 404(b)

18

> is silent on whether, in a criminal case, the Committee viewed
> entrapment as a defense that places the defendant's character at issue.
> The courts, since the adoption of the Federal Rules, have admitted
> evidence of the defendant's character when entrapment is raised, as
> they did under previous law, for the most part without analyzing how
> this use of character evidence fits in under Rule 404.

2 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 404.10(2)

(Joseph M. McLaughlin ed., 2d ed. 2005).

In People v. Calvano, the New York State Court of Appeals held that the rationale for

allowing the admission of prior criminal acts when an entrapment defense is asserted also applies

when a defendant asserts a duress defense. 30 N.Y.2d at 205. The court reasoned that since, in

the case of entrapment, evidence of similar acts is admissible to refute a claim that the defendant

was induced or encouraged to commit the crime, there is no reason why such evidence should not

be similarly admissible to refute a claim that the defendant was coerced into committing the

crime. Id. Nonetheless, the Court of Appeals cautioned that "[c]ollateral evidence of this nature

must always undergo the scrutiny and preliminary evaluation of the Trial Judge, who is charged

with the responsibility of excluding it when its relevance to disposition is remote or its probative

effect so doubtful as to be outweighed by the prejudice its reception will engender." Id. at 206.

Since Calvano, New York courts have allowed evidence of prior criminal acts to rebut a duress

defense, though the caselaw has not elaborated on how similar the charged and other offenses

must be to warrant admission. See, e.g., People v. Rosado, 244 A.D.2d 772, 776, 666 N.Y.S.2d

227 (3d Dep't 1997) (affirming trial court's allowance of evidence of prior robbery to rebut

duress defense where defendant was charged with burglary, murder, and robbery for assisting

another to carry out the "execution-style slayings" of his father and another individual); cf.

19

People v. Jackson, 227 A.D.2d 137, 138-40, 641 N.Y.S.2d 840 (1st Dep't 1996) (holding that defendant was denied a fair trial where the prosecution admitted evidence of subsequent armed robbery to rebut defendant's defense that he was coerced into assisting a gang member who shot and attempted to kill a drug dealer).

Federal caselaw on this issue recognizes the admissibility of prior criminal acts to rebut a duress defense. However, rather than suggest, as Calvano does, that the prior acts are admissible on the issue of criminal disposition, the federal courts have insisted that the prior acts be evidence of intent. See, e.g., United States v. Verduzco, 373 F.3d 1022, 1030 (9th Cir. 2004) (affirming district court's allowance of evidence of a prior drug smuggling incident two years prior to the charged "nearly identical smuggling episode"); United States v. Boon San Chong, 829 F.2d 1572, 1575-76 (11th Cir. 1987) (duress defense properly rebutted by evidence of prior home invasion at gunpoint where defendant was charged in later similar incident); United States v. Hunter, 672 F.2d 815, 817 (10th Cir. 1982) (affirming district court's allowance of evidence of prior bank robbery to rebut duress defense where the prior incident "was very close to the one at issue in point of time and in method of commission").

By focusing on "intent" rather than "disposition," the federal approach is, by its very language, more narrow. It allows for the admission of a prior act that is "similar to the charged offense and is proximate in time to the charged offense," in which case "the extrinsic act is relevant and highly probative on the issue of the defendant's state of mind." Boon San Chong,

20

829 F.2d at 1576; <u>United States v. Holman</u>, 680 F.2d 1340, 1350 (11th Cir. 1982).[4] Regardless of terminology, however, a trial court's basic task remains the same: to reasonably weigh the evidence's probative value against its potential for prejudice. When the scales tilt heavily against the trial court's decision, the due process clause is implicated. This is not such a case.

Here, petitioner testified that he was coerced into carrying the murder weapon. It is thus somewhat relevant that, just months earlier, petitioner was arrested after being found in the proximity of another firearm. The relevance of the charge goes beyond petitioner's general criminal character; that is, the evidence says something more than that petitioner is "a bad man." See <u>United States v. Williams</u>, 577 F.2d 188, 191 (2d Cir. 1978). As such, the trial court may have reasonably determined that the evidence's probative value was sufficient to overcome the claim of accompanying prejudice. <u>Cf.</u> <u>Dunnigan v. Keane</u>, 137 F.3d 117, 125 (2d Cir. 1998) ("Where the prejudicial evidence is 'probative of [an] essential element' in the case, its admission does not violate the defendant's right to due process.") (quoting <u>Estelle v. McGuire</u>, 502 U.S. 62, 69, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)) (alteration in original).

---

[4] One commentator has opined that "the hair-splitting analysis of deciding whether an uncharged bad act helps to establish the defendant's intent to commit the crime, or his disposition to do so, may be nothing more than semantic." Lisa Marie De Sanctis, <u>Bridging the Gap Between the Rules of Evidence and Justice for Victims of Domestic Violence</u>, 8 Yale J.L. & Feminism 359, 384 (1996). On this point, the Court notes that when fast-moving spontaneous conduct is at issue – either in the charged offense or separate act – the difficulty in meaningfully distinguishing between "intent" and "disposition" becomes most acute. As the Fifth Circuit has observed,

> the evidence of prior crimes involving intent of the moment are hardly ever probative of later acts involving similarly split-second intent. Indeed, such prior crimes have less to do with the type of specific intent that may arise later, as in fraud, than they do with the defendant's overall disposition or character; and if there is one clear category that is not an exception to the general rule against allowing evidence of prior acts, it is that which includes "character, disposition, and reputation."

<u>United States v. San Martin</u>, 505 F.2d 918, 923 (5th Cir. 1974); <u>see also</u> <u>Cauley</u>, 697 F.2d at 489.

21

This Court may not have reached the same conclusion under Federal Rules of Evidence 404(b) and 403 if such evidence had been offered before it as a trial court,[5] but that is beside the point. Habeas review is not the venue for second-guessing close evidentiary calls. See 28 U.S.C. § 2254(d)(1); Williams v. Taylor, 529 U.S. 362, 410-11, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The trial court's evidentiary ruling was not so errant as to warrant relief under the deferential AEDPA standard. And furthermore, the Second Circuit has made clear that "[f]or the erroneous admission of other unfairly prejudicial evidence to amount to a denial of due process, the item must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" Dunnigan, 137 F.3d at 125 (quoting Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992)).

The evidence against petitioner was overwhelming. It was undisputed at trial that he shot the Ramirez brothers, and further, all of the witnesses to the shooting testified that Maldonado shouted an expletive as he fired at Jimmy Ramirez's head from less than two feet away. Petitioner's duress defense was completely uncorroborated. In fact, the only two witnesses who actually observed Maldonado taking the firearm directly disputed his duress defense. Further, on a closely related point, multiple witnesses testified that Wilfredo Hernandez stated that his gun would not be used to shoot anyone. As to other matters, petitioner's account was wholly illogical and included a concession that he had lied to a police detective when he was interviewed regarding the shooting. In sum, given the exceedingly weak nature of petitioner's duress defense

---

[5] Although he was arrested in the prior incident, Maldonado was never charged with possession of the weapon. The evidence of his guilt, moreover, was not especially strong. Furthermore, the prior incident involved pure possession, whereas here, petitioner was given the weapon in a fast-moving sequence just moments before he shot the victims.

in the first place, it is hard to fathom how the admission of the disputed evidence could have impacted the verdict at all, much less eliminated a reasonable doubt relating to petitioner's claim of duress. The writ cannot issue on this ground.

III.   *Excessive Sentence Claim*

Petitioner's contention regarding the harsh and excessive nature of his sentence was heard and rejected by the Second Department. A state court's sentence that falls within the state statute's authorized range is not ordinarily susceptible to an Eighth Amendment challenge. Brown v. Perlman, No. 03-cv-2670, 2006 WL 2819654, at *7 (S.D.N.Y. Sep. 29, 2006); Davis v. Johnson, 258 F. Supp. 2d 93, 104 (E.D.N.Y. 2003) (citing Dorsey v. Irvin, 56 F.3d 425, 427 (2d Cir.1995); White v. Keane, 969 F.2d 1381, 1383 (2d Cir.1992) (per curiam)). A habeas petitioner may attempt to challenge his sentence on the ground that it is grossly disproportionate to the offense charged, but that standard is satisfied only in the "exceedingly rare" and "extreme" noncapital case. Lockyer v. Andrade, 538 U.S. 63, 73, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (quoting Harmelin v. Michigan, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)). A disproportionality challenge is usually to no avail, and such is the case here, given that no Supreme Court precedent or other federal authority even remotely suggests that any of petitioner's sentences – 25 years to life for second-degree murder, 10 years concurrently for weapons possession, and 20 years consecutively for attempting to murder a second individual[6] –

---

[6] New York law allows for the imposition of consecutive sentences where the defendant fires shots at multiple victims during a single criminal transaction. See Hardison v. Artus, No. 06-cv-322, 2006 WL 1330064, at *14 (S.D.N.Y. May 16, 2006); Figueroa v. Greiner, No. 02-cv-5444, 2005 WL 249001, at *16 (S.D.N.Y. Feb. 3, 2005); Gaiter v. Lord, 917 F. Supp. 145, 154 (E.D.N.Y. 1996). As Judge Trager has stated in one such case, "[t]he federal courts have consistently held sentences such as the one imposed, and even those which are more severe, are not violative of the Constitution." Gaiter, 917 F. Supp. at 155. Indeed, at sentencing, defense counsel conceded that

23

is disproportionate under the Eighth Amendment. Petitioner's claim is rejected as meritless.

IV.    *Failure to Submit Intentional Murder Counts in the Alternative*

Lastly, petitioner claims that he was denied "his due process right when the trial court failed to submit intentional murder counts of the indictment to the jury in the alternative." Under New York law, "[w]here a defendant is charged with a single homicide, in an indictment containing one count of intentional murder and one count of depraved mind murder, both counts may be submitted to the jury, but only in the alternative." People v. Gallagher, 69 N.Y.2d 525, 528, 516 N.Y.S.2d 174 (1987); N.Y. Crim. Proc. Law § 300.40(5). Petitioner has not raised this claim to any state court, and given that the claim is an on-the-record claim that must be raised on direct appeal, see N.Y. Crim. Proc. Law § 440.10(2)(c), petitioner is now barred from raising the claim in state court. Regardless, the claim is completely without a factual basis, as a quick review of the verdict sheet shows that the inconsistent counts were, in fact, submitted to the jury in the alternative. The claim is thus both procedurally barred and completely baseless.

## CONCLUSION

For the reasons set forth above, the petition for a writ of habeas corpus is dismissed. Since petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

Dated: Brooklyn, New York
      January 19, 2007

ERIC N. VITALIANO
United States District Judge

---

the trial court could legally impose consecutive sentences on petitioner under New York law.